**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re   **SHAI TZABARI** | : | **Chapter 7** |
| | : | |
| | : | **Bky. No. 18-15854 ELF** |
| **Debtor** | : | |
| | : | |
| **WALNUT MEADOWS, LLC,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SHAI TZABARI,** | : | |
| **Defendant** | : | **Adv. No. 19-026** |
| | : | |

**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**

# O P I N I O N

**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**

## I.  INTRODUCTION

In this adversary proceeding, Walnut Meadows LLC ("the Plaintiff") objects to the discharge of Debtor Shai Tzabari ("the Debtor").  The Plaintiff alleges that the Debtor failed to read his bankruptcy petition, schedules and statements before filing them and that the disclosures contained numerous false and/or inconsistent statements, all of which rises to the level of a "false oath or account" under 11 U.S.C. §727(a)(4)(A).

Alternatively, the Plaintiff seeks a determination that its claim against the Debtor is nondischargeable under 11 U.S.C. §523(a)(6).  The Plaintiff alleges it suffered a willful and malicious injury when the Debtor knowingly and intentionally stored his manufactured home on a Walnut Meadows lot for almost three (3) years without paying ground rent or storage fees.

1

The Debtor answered the complaint on February 17, 2019.  This court conducted a trial of

this adversary proceeding on November 25, 2019.  Thereafter, the parties submitted proposed

findings of fact and conclusions of law in support of their positions, the last of which was filed on

January 24, 2020.

For the reasons set forth below, I find the Plaintiff has failed to prove its case under either

11 U.S.C. §523(a)(6) or 11 U.S.C. §727(a)(4)(A).  Therefore, I will enter judgment in the Debtor's

favor.


## II.  FINDINGS OF FACT

Based on the credibility and demeanor of the trial witnesses, the plausibility of their

testimony, the existence of corroborating circumstantial, testimonial or documentary evidence, the

totality of the evidentiary record presented at the trial, and my consideration of the parties' post-

trial submissions, I make the following findings of fact:


### Debtor Shai Tzabari

1. The Debtor was born in Israel and arrived as an adult in the United States in May 1991.
   (Audio 1:08:23; Audio 1:09:03).[1]

2. The Debtor does not speak English fluently and does not read English well.  (Audio
   1:08:47).

3. The Debtor's first language is Hebrew.  The Debtor understands and speaks English, but
   not with the fluency of a natural speaker.  He required the use of a translator, his wife Mrs.

---

[1]        The parties chose not to order an official transcript of the trial and relied upon citation to
the unofficial audio recording, Doc. # 28, in their citations to the testimony.  I will do likewise.  Citations
to time reference the passage of time after the commencement of the trial.

Tzabari ("Mrs. Tabari"), to fully participate at trial.  (Audio 1:05:13).[2] The Debtor is able

to read some English.  (Audio 2:00:23). The Debtor speaks English with his customers.

(Audio 2:03:05).

4.  The Debtor labors as a handyman.  Mrs. Tzabari, does the paperwork for the Debtor's

handyman business and handles the family's household and financial affairs (Audio

1:09:40; Audio 2:07:50 – Audio 2:09:50).

5.  During both state court proceedings and bankruptcy proceedings, the Debtor was

diagnosed with cancer and was receiving treatments. (Audio 1:37:42; Audio 2:11:04).


### Walnut Meadows

6.  Walnut Meadows is a manufactured home community in Harleysville, PA.  (Joint Pre-Trial

Statement ¶4.b.; Audio 3:20).

7.  Tenants of Walnut Meadows own their mobile homes while paying ground rent to the

Plaintiff for the privilege of locating their homes on a lot in Walnut Meadows. (Joint Pre-

Trial Statement ¶4.c.).

8.  Ms. Andrea Johnson is currently employed with GSP Management as a regional manager

and was the Walnut Meadows' manager at the time the Debtor owned the mobile home.

(Audio 2:42; Audio 3:00).

9.  Ms. Johnson is licensed by the Commonwealth of Pennsylvania as vehicle salesperson and,

as such, may engage in the sale and resale of mobile homes.  (Audio 44:31).

---

[2]      Although Mrs. Tzabari is an interested party, the Plaintiff consented to her serving as her
husband's translator at trial.  While I do not speak Hebrew, it appeared to me that her translation was honest
and accurate.  I base this observation on: the comparative length of the answers in Hebrew and the
translation; the ease and speed with which Mrs. Tzabari translated the Debtor's testimony and her overall
demeanor.  This observation applies as well to Mrs. Tzabari's independent testimony at trial.  I found her
to be a credible witness.

10. In November 2019, the lots in Walnut Meadows were 100% occupied.  (Audio 3:32).

11. From 2015 and 2019, Plaintiff charged residents between rent at the range between $720 and $777 per month.  (Audio 4:02).

12. A Walnut Meadows homeowner who wishes to dispose of a mobile home may sell the mobile home, tow the mobile home out of Walnut Meadows, or demolish the mobile home. (Audio 6:00).

13. If a Walnut Meadows homeowner sells his mobile home, the purchaser must be approved by the Plaintiff before moving into the community.  (Audio 6:15).

14. The Plaintiff does not allow mobile homeowners to store their homes in the community; the Plaintiff wants homeowners to live in the community. (Audio 6:50).

## The Debtor's Ownership of the Mobile Home

15. On October 15, 2015, the Debtor purchased a mobile home at a tax sale conducted by the Montgomery County Tax Claim Bureau.  (Joint Pre-Trial Statement ¶4.a.).

16. The home was located on a lot in Walnut Meadows.  (Joint Pre-Trial Statement ¶4.b.; Audio 3:17).

17. The Debtor purchased the mobile home at the Sheriff's sale believing he was buying a house and land.  (Audio 1:19:11; Audio 1:21:05).

18. After he purchased the mobile home, the Debtor discovered it was uninhabitable and unsaleable due to mold.  (Audio 1:24:48).

19. When the Debtor purchased the mobile home, he was not aware that he would have to pay rent.  (Audio 1:23:47).

4

20. A few months after Debtor purchased the mobile home, Ms. Johnson contacted the Debtor and informed him that he was required to pay rent to keep the mobile home in the community and that the Plaintiff would work with him so that the Debtor could either: (a) fix the mobile home so that it could be sold, (b) tow the mobile home from the community, or (c) demolish the mobile home.  (Audio 8:13).

21. Ms. Johnson informed the Debtor he was required to sign a lease to keep the mobile home in the community, but the Debtor never signed a lease.  (Audio 9:50).

22. The Debtor offered to pay rent while he fixed up the mobile home, but the Debtor did not pay any rent or other fees to the Plaintiff (Audio 8:53; Audio 31:10).

23. The Debtor offered the mobile home to Walnut Meadows for free. (Audio 1:24:48).

24. The Debtor then offered the mobile home on Craigslist for free.  (Audio 1:25:35; Audio 1:25:47; Audio 1:26:25). The Debtor received only one response.  (Audio 1:26:35).

25. On January 12, 2016, the Debtor entered into an agreement whereby a purchaser would remove the mobile home from Walnut Meadows. (Audio 1:27:38). The purchaser backed out of the deal with Debtor when the purchaser discovered how much it would cost to remove the mobile home, which caused the Debtor to relist the property on Craigslist. (Audio 1:28:11; Audio 1:28:36).

26. After Walnut Meadows filed a lawsuit against him, the Debtor engaged an attorney to help him sell the mobile home.  (Audio 1:29:10). An entity known as Mustard House Branch Trust Limited ("Mustard House") acquired the mobile home from the Debtor.  (Audio 35:09).   The Debtor signed some papers and the attorney told him the mobile home had been sold.  (Audio 1:29:25).

5

27. The deed to the mobile home was dated August 21, 2016. (Audio 1:30:31).  The Debtor relied upon his attorney to handle the sale of the mobile home and to notify Walnut Meadows and the court of common pleas of the sale.  (Audio 1:31:02).

28. After the transfer of the mobile home to Mustard House, the Debtor was unable to continue paying his lawyer's fees. (Audio 1:32:15).

29. At some point after the Plaintiff commenced litigation against the Debtor, Ms. Johnson was advised by the Plaintiff's legal counsel that the Debtor no longer owned the mobile home because it had been sold.  (Audio 13:38).

**State Court Actions**

30. The Plaintiff originally filed an action against the Debtor before the District Justice in Harleysville.  The Debtor and his attorney appeared at the District Justice hearing.  The District Justice dismissed the action because the Plaintiff had filed it in the wrong court. (Audio 41:43).

31. On June 20, 2016, the Plaintiff initiated a civil action against the Debtor in the Court of Common Pleas of Montgomery County ("the CP Court"), alleging claims of ejectment, trespass, and unjust enrichment.  (Joint Pre-Trial Statement ¶4.g.).

32. On September 26, 2017, the CP Court entered a default judgment in the amount of $14,047.92 in favor of the Plaintiff and against the Debtor, awarded the Plaintiff possession of the lot, and ordered the Debtor to remove the home from the lot within 30 days. (Joint Pre-Trial Statement ¶4.h.).

33. The Debtor did not remove the home from the lot in compliance with the CP Court's September 26, 2017 Order.  (Id.).

34. On July 12, 2018, the CP Court granted the Plaintiff's contempt motion by default, authorized the Plaintiff to demolish the mobile home, awarded the Plaintiff $5,000 in removal costs, and increased the judgment in favor of the Plaintiff as a result of additional storage fees to $23,972.14.  (Joint Pre-Trial Statement ¶4.j.).

35. On August 14, 2018, following the Debtor's failure to remove the home from Walnut Meadows, the CP Court entered an amended judgment of $28,972.14 in favor of the Plaintiff and against the Debtor.  (Joint Pre-Trial Statement ¶4.k.).

36. The Debtor did not appeal the CP Court's judgment and orders.  (Joint Pre-Trial Statement ¶¶4.i., 4.l.).

37. The Debtor did not participate in the proceedings before the CP Court because he did not have any money to pay a lawyer and he did not think his English was good enough.  (Audio 1:36:43; Audio 2:12:05).

38. The Plaintiff continued the litigation against the Debtor after it was notified that Mustard House was the owner of the mobile home, (Audio 35:30), but the Debtor did not provide Ms. Johnson with a copy of the quit claim deed transferring the mobile home to Mustard House.  (Audio 45:37).

39. When the CP Court ordered the Debtor to remove the mobile home, he did not think he was legally entitled to remove the mobile home because he believed he no longer owned the mobile home.  (Audio 1:40:29).  In any event, the Debtor did not have the money to remove the mobile home. (Audio 1:36:03).

40. The Debtor was unable to afford the $10,000 removal fee that was quoted to him by a removal company.  (Audio 1:34:03).

41. The Debtor did not bear any ill will toward the Plaintiff and did not intend to harm the Plaintiff.  (Audio 1:33:10).

42. The Debtor did not understand that his failure to remove the mobile home from Walnut Meadows could be considered trespass.  (Audio 1:43:10).

43. Within three (3) months of demolition of the mobile home, the Plaintiff had obtained a new tenant for the lot formerly occupied by the home.  (Audio 16:35).

**The Debtor's Bankruptcy**

44. The Debtor filed his Chapter 7 petition on September 5, 2018.  (Joint Pre-Trial Statement ¶4.m.).

45. When the Debtor filed his Chapter 7 petition, he signed his name and declared under penalty of perjury that the answers and information provided in the Chapter 7 Petition, Official Form 106Dec, Statement of Financial Affairs ("SOFA"), Chapter 7 Means Test Calculation and the Chapter 7 Statement of Current Monthly Income were "true and correct."  (Joint Pre-Trial Statement ¶¶4.o., 4.p., 4.q., 4.r.).

46. Mrs. Tzabari accompanied the Debtor to fill out the bankruptcy paperwork at his lawyer's office.  (Audio 1:10:43).

47. The Debtor needed his wife's help to fill out the bankruptcy paperwork because he did not know all the necessary information, he has a bad memory and he is terrible with paperwork. Also, Mrs. Tzabari normally handles all family and business paperwork.  (Audio 1:12:23; Audio 2:08:27).

48. The Debtor required his wife's help to answer almost all of the questions in the bankruptcy paperwork.  (Audio 1:48:52).

49. The answers provided by the Debtor on the initial paperwork were true to the best of his knowledge at that time.  (Audio 1:13:23).

50. The Debtor relied heavily upon his wife when filling out the paperwork because he does not understand legal terms in English.  (Audio 1:14:41).

51. When filling out the bankruptcy paperwork, the Debtor made a mistake by failing to initially disclose that he had an ownership interest in an entity called Cambridge Remodeling, but he later disclosed that information to the Trustee.  (Audio 1:46:56).

52. The Debtor did not intend to withhold any information from the bankruptcy court when filling out the paperwork and the Debtor and his wife tried to correct the errors when they were discovered.  (Audio 1:49:13; Audio 2:09:10).

53. When asked during a deposition to identify whether the papers in front of him were his bankruptcy petition, the Debtor was unable to identify the papers and stated his wife, Mrs. Tzabari, filled out the bankruptcy petition. (Audio 21:50).

54. According to Mrs. Tzabari, the Debtor relies upon her to read documents because he has trouble reading English and if shown a document at a deposition would need time and a translation to read a document.  (Audio 2:11:23).

55. Mrs. Tzabari's perceived that the Debtor was very concerned and anxious regarding his testimony at both the creditor's meeting and the trial.  (Audio 2:09:55).

56. At trial, the Debtor and Mrs. Tzabari tried to answer questions honestly and were generally credible.

### III.  LEGAL STANDARDS FOR DENIAL OF DISCHARGE
### UNDER §727(a)(4)(A)
### AND DETERMINATION OF NONDISCHARGEABILITY §523(a)(6)

#### A.  Count I:  §727(a)(4)(A)

Under §727(a) of the Bankruptcy Code, an individual chapter 7 debtor is entitled to a

discharge unless one of several specified grounds for denial of discharge applies.  A court's

denial of a debtor's discharge is "an extreme step and should not be taken lightly."  In re Burke,

523 B.R. 765, 769 (Bankr. E.D. Pa. 2015) (quoting Rosen v. Bezner, 996 F.2d 1527, 1531 (3d

Cir. 1993)).  Thus, the discharge provision is construed in favor of debtors.  Id.

Pursuant to §727(a)(4)(A), a debtor may be denied a discharge if "the debtor knowingly

and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C.

§727(a)(4)(A).

Section 727(a)(4)(A) is designed to ensure that the debtor provides honest and reliable

information to the trustee and others interested in the administration of the bankruptcy estate

without their having to conduct costly investigations to discover the debtor's true financial

condition.  E.g., In re Singh, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010) (citing cases); accord In

re Von Kiel, 461 B.R. 323, 340 (Bankr. E.D. Pa. 2012), aff'd, 550 F. App'x 105 (3d Cir. 2013).

A successful challenge to a debtor's discharge under §727(a)(4)(A) requires a showing by

a preponderance of the evidence that:

> (1) the debtor made a false statement under oath;
>
> (2) the debtor knew the statement was false;
>
> (3) the debtor made the statement with the intent to deceive; and
>
> (4) the statement was material to the bankruptcy case.

Singh, 433 B.R. at 154.

A false statement is made knowingly if the statement is (1) known by the debtor to be false; (2) made without belief in its truth; or (3) made with reckless disregard for the truth. E.g., In re Young, 576 B.R. 807, 815 (Bankr. E.D. Pa. 2017).

In general, the plaintiff carries its burden to prove that a false statement was made knowingly if the plaintiff demonstrates the debtor knew the truth "and nonetheless willfully and intentionally [swore] to what is false." Singh, 433 B.R. at 154 (quoting Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007)). An honest mistake or oversight is not sufficient to deny a debtor his or her discharge. Spitko, 357 B.R. at 312. However, case law provides that reckless disregard for the accuracy of the oaths made in a bankruptcy case satisfies the scienter requirement under §727(a)(4). Daniels v. Agin, 736 F.3d 70, 85 (1st Cir. 2013) (citing In re Tully, 818 F.2d 106, 112 (1st Cir. 1987)); In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992); Scimeca v. Umanoff, 169 B.R. 536, 543 (D.N.J. 1993) (citing cases), aff'd sub nom In re Scimeca, 30 F.3d 1488 (3d Cir. 1994) (Table); accord In re Spitko, 357 B.R. 272, 313-14 (Bankr. E.D. Pa. 2006).

The plaintiff may prove the requisite intent under §727(a)(4) by circumstantial evidence or it may be inferred from a pattern of nondisclosure and concealment. E.g., In re Oakley, 503 B.R. 407, 426 (Bankr. E.D. Pa. 2013), aff'd, 530 B.R. 251 (E.D. Pa. 2015).

An omission is considered material under §727(a)(4) when the subject "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or existence and disposition of property." Young, 576 B.R. at 814; accord In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984); see also In re Dawley, 312 B.R. 765, 784 (Bankr. E.D. Pa. 2004). However, the plaintiff need not demonstrate proof of actual harm to creditors. Id. Further, "a relevant concern under §727(a)(4)(A) is the degree to which, if any, that misstatement impeded the proper administration of the bankruptcy case." Singh, 433 B.R. at 156.

### B.  Count II:  §523(a)(6)

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. §523(a)(6).

"Willful" and "malicious" are distinct elements. E.g., In re Coley, 433 B.R. 476, 497 (Bankr. E.D. Pa. 2010).

A "willful" injury is an injury that is done deliberately or intentionally.  Id. (citing Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). In Geiger, the Supreme Court clarified that in §523(a)(6):

> [t]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

523 U.S. at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

In the Third Circuit, "actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are 'willful' within the meaning of §523(a)(6)."  Coley, 433 B.R. at 497 (citing In re Conte, 33 F.3d 303, 307-09 (3d Cir. 1994)).

"Malice refers to actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."  In re Kates, 485 B.R. 86, 101 (Bankr. E.D. Pa. 2012) (internal quotations omitted).  The "wrongfulness" which characterizes malice involves

> conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances."

In re Jacobs, 381 B.R. 128, 139 (E.D. Pa. Bankr. 2008) (quoting In re Long, 774 F.2d 875, 881

(8th Cir.1985)).

Thus, to prevail the plaintiff must establish three (3) elements demonstrating that the debt

arose from an injury that was:

> (1) willful (i.e., involving deliberate and intentional conduct);
>
> (2) intended or substantially certain to cause injury; and
>
> (3) malicious (i.e., wrongful).

In re Didio, 607 B.R. 804, 817 (Bankr. E.D. Pa. 2019) (citations omitted).

The objecting creditor bears the burden of proof and "must show by a preponderance of

the evidence all essential elements demonstrating that a claim is nondischargeable."  In re Catalan,

590 B.R. 678, 684 (Bankr. E.D. Pa. 2018) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)).

## IV.  DISCUSSION

### A.  §727(a)(4)(A)

#### 1.

In objecting to the Debtor's discharge under §724(a)(4)(A), the Plaintiff points to the

following admissions made by the Debtor during his deposition, where he testified that:

> (1) He did not know whether the $14,217.00 in unsecured claims listed in Part 4 box
> 6J of Schedule E/F was correct.
>
> (2) He did not read all of Part 2 of his Chapter 7 Bankruptcy Petition.
>
> (3) He did not know what amount his wife put in his Chapter 7 bankruptcy petition for
> monthly home maintenance (Schedule J, Part 2).
>
> (4) He did not know why the amount for monthly clothing, laundry, and dry-cleaning
> expenses was amended downward after filing his petition from $900.00 to $300.00
> (Schedule J, Part 2).

13

(5) He did not know what the $20.00 amount for "renters' insurance" was for on his petition since he owned his own home (Schedule J, Part 2).

(6) He did not know why the monthly entertainment expenses were increased after filing his petition from $100.00 to $200.00 (Schedule J, Part 2).

(Plaintiff's Mem. at 12).

Based on these admissions, the Plaintiff makes two (2) arguments: (1) that the Debtor made certain disclosures with a sufficient degree of recklessness as to constitute a false oath; and (2) more globally, that the Debtor's failure to read the petition, schedules and SOFA before they were filed rises to the level of a false oath.

The Plaintiff focuses mostly on the second argument, asserting that the Debtor did not actively participate in the preparation of his Chapter 7 petition and the accompanying schedules, but rather just allowed his wife to fill out the forms.

Relying on Bohm v. Dolata, 306 B.R. 97, 149-50 (Bankr. W.D. Pa. 2004), the Plaintiff argues that a debtor who concedes he has not read the bankruptcy petition and the accompanying forms, but who signs the included declarations attesting that the answers provided are "true and correct" has made a false oath with fraudulent intent and, accordingly, a discharge must be denied. The Plaintiff contends the Debtor's failure to check whether the information his wife provided was correct constitutes reckless indifference to the truth that was material to the bankruptcy case.

I am not persuaded by either of these arguments.

**2.**

With respect to the inaccurate estimates of ongoing monthly expenses provided on Schedule J, the Plaintiff failed to sustain its evidentiary burden.  The Plaintiff failed to prove that any inaccuracies constituted a false statement, that the Debtor had an intent to deceive and that the

any inaccuracies were material.

The Chapter 7 petition and the accompanying schedules and statements do not require a debtor to provide information with pinpoint accuracy.  Singh, 433 B.R. at 155 ("Schedule J requires the Debtor to estimate monthly expenses.").  The schedules repeatedly advise a debtor to "[b]e as complete and accurate as possible" and Schedule J merely requires a debtor to estimate ongoing monthly expenses.

Within two (2) months of making his initial disclosures, the Debtor filed amended schedules that more accurately depicted his ongoing monthly expenses.

The revision of estimated expenses, by itself, does not show that the Debtor knew the original disclosures were false or made with fraudulent intent.  Some additional context is necessary to permit the court to infer that a monthly expense estimate should be characterized as false and fraudulent. The Plaintiff presented no such additional evidence.

Further, the Plaintiff did not articulate any convincing argument that the inaccuracies regarding the Debtor's original, estimated monthly expenses were material in this bankruptcy case or how they obstructed (or even reasonably could have obstructed) the efforts of the trustee or creditors to investigate the Debtor's financial affairs.


**3.**

With respect to the Plaintiff's allegations regarding the Debtor's failure to read all of Part 2 of his Chapter 7 petition and, more generally, the other schedules and statements, in the circumstances presented here, the Plaintiff has not proven that the Debtor made a false oath with an intent to deceive.

As an adult immigrant to the United States, the Debtor is not a native English speaker.

Based on the testimony provided by the Debtor and his wife, Mrs. Tzabari, and my in-court observation of the Debtor, I find that the Debtor's English language capabilities can best be described as conversational with regard to spoken English, with minimal comprehension of written English.

It is therefore fully understandable and reasonable that, as a matter of ordinary course, the Debtor relies upon his wife to handle any paperwork and monetary transactions for both his business activities and their household affairs.  Without the aid of his wife, the Debtor was incapable of comprehending the contents the Chapter 7 petition and accompanying schedules, and also incapable of providing the requested information.  Consequently Mrs. Tzabari was the person best positioned to aid the Debtor in filling out the petition and schedules as she possessed both the information necessary to complete the paperwork and the language fluency to navigate the documents.  While the Debtor admittedly did not read his entire Chapter 7 petition, the evidence shows that the Debtor and his wife spent a considerable amount of time in counsel's office jointly filling out the paperwork.  The entire process appears to have been a good faith, joint effort to comply with the Debtor's obligations as a chapter 7 debtor.

I acknowledge the existence of the passage in the  Bohm opinion that suggests that a debtor who fails to read his bankruptcy schedules or SOFA but nevertheless signs the declaration stating that he or she has read the document has fraudulently uttered a false oath.  See Bohm, 306 B.R at 150.  The broad holding that the Plaintiff extracts from that decision is not binding on this court.  But more importantly, for several reasons, I do not find that decision persuasive in the present context.

First, a debtor's failure to personally read the schedules matters only if there are material misstatements and omissions in the schedules and accompanying statements (including the

SOFA).  In <u>Bohm</u>, the schedules and statements were replete with numerous, material errors and omissions which, compounded by the debtors' failure to read the documents, led the court to conclude that the debtor knowingly made false oaths with an intent to deceive.  Here, the errors were far more modest by comparison and it would be a stretch to categorize them as material.[3]

Second, the Debtor here had language and comprehension problems that caused him to rely on a trusted advisor -- his wife -- to play a major role in assisting him in fulfilling his obligations as a chapter 7 debtor.  <u>Absent other indicia of fraudulent intent</u>, I see nothing in that conduct that should cause a forfeiture of a debtor's chapter 7 discharge.

To some extent, the Debtor's conduct here is analogous to that of a principal of a business debtor who signs off on a relatively complicated set of bankruptcy disclosures by relying on the detailed information provided to counsel by the business' chief financial officer ("CFO") -- not an uncommon scenario.  In that situation, while the principal who signs the verification of the bankruptcy schedules or statements, in a technical sense, has "read" the documents, the principal may well have no personal knowledge of the accuracy and honesty of the disclosures.  Is that so different from what occurred here?

Notwithstanding the Debtor's admission that he did not read all of the documents, denial of discharge under §727(a)(4) requires a showing that the Debtor made the statement with the intent to deceive and the statement was material to the bankruptcy case.  There is no evidence that

---

[3]         Consider, for example, the Plaintiff's complaint that the Debtor did not read Part 2 of the bankruptcy petition.  That section of the petition asks the debtor to state the chapter under which the case is being filed, the manner in which the filing fee will be paid, whether the debtor filed any previous bankruptcies (and if so when and where the cases were filed), whether there any pending affiliate bankruptcies and whether the debtor is a tenant.

In this case, the Debtor chose chapter 7, stated that the full filing fee would be paid with the filing of the petition and answered all of the remaining questions in the negative.  There is nothing in the record to indicate that the Debtor's negative responses were incorrect, much less fraudulent.

would lead me to infer circumstantially that the Debtor intended to deceive when he failed to read the documents. Rather, the evidence shows that this was attributable to his limited English reading capabilities.

For these reasons I conclude that there is no basis to deny the Debtors' discharge under 11 U.S.C. §727(a)(4).[4]

### B. §523(a)(6)

In seeking a determination of nondischargeability under 11 U.S.C. §523(a)(6), the Plaintiff argues the Debtor committed a continuing act of trespass upon its land by failing to remove the mobile home from Walnut Meadows. The Plaintiff alleges this failure caused it to suffer a willful and malicious injury.

As explained below, I conclude that the element of "willfulness" is lacking in this case and therefore, the §523(a)(6) nondischargeability claim fails

### 1.

The Plaintiff notes that under Pennsylvania law, a trespass is "created by the continued presence on the land of a thing if the actor, having acquired his legal interest in the thing with knowledge of such tortious conduct or having thereafter learned of it, fails to remove the thing." Kowalski v. TOA PA V, L.P., 206 A.3d 1148, 1161 (Pa. Super. 2019) (internal quotations omitted) (quoting Restatement (2d) of Torts, §161(2)). The Plaintiff also asserts a continuing trespass

---

[4]      Plaintiff also argues the Debtor's inability to confirm the accuracy of the information provided in Part 4 box 6J of Schedule E/F should bar him from receiving a discharge. Given that the directions for Part 4, Question 6 state that "[t]his information is for statistical reporting purposes only," I reject any suggestion that any omissions or misstatements provided in this part are material to the bankruptcy case.

occurs when a person "intentionally fails to remove a thing from the land in violation of a duty."

See id. (quoting Restatement (2d) of Torts, §158).

The Plaintiff alleges the Debtor committed a continuing trespass because the mobile home was located on a ground rent lot in Walnut Meadows for which the Debtor failed to sign a lease or storage agreement and pay rent or storage fees.  As a result of these failures, it was wrongful for the Debtor to keep the mobile home in Walnut Meadows.  Further, the Plaintiff obtained an order from the CP Court directing the Debtor to remove the mobile home, an order with which the Debtor failed to comply.

Based on these undisputed facts, the Plaintiff contends that the Debtor intentionally engaged in a wrongful act by leaving the mobile home on a lot in Walnut Meadows and, thus, deprived Plaintiff of the opportunity to collect ground rent, satisfying the all of the elements of §523(a)(6).[5]

---

[5]       The Debtor asserted that he believed that he lacked the right to demolish the mobile home once he transferred the property to Mustard House.  In response the Plaintiff contends that this argument is is specious because under Pennsylvania, a mobile home is  considered a "vehicle" and that under the Pennsylvania Vehicle Code, it may not be transferred via deed; rather, a change in ownership must be accomplished via the transfer of a motor vehicle title from one owner to another.  See 75 Pa.C.S. §1111(a) ("In the event of the sale or transfer of the ownership of a vehicle within this Commonwealth, the owner shall execute an assignment and warranty of title to the transferee").

I will not dwell on this argument because I believe that it misses the point.  Regardless whether the Debtor effected a valid transfer of ownership of the property to Mustard House, the Debtor testified credibly that he believed that he had done so.  Since the critical issue under §523(a)(6) is "willfulness," which turns on the Debtor's scienter, it does not matter whether the transfer was truly valid. The issue is whether the Debtor's honestly believed he had transferred the property and I credit the Debtor's testimony that he believed he no longer owned the mobile home after his attorney arranged for its transfer to Mustard House via quit claim deed and that he lacked the authority to either demolish or remove the mobile as directed by the CP Court.  I also conclude that the Debtor had a reasonable basis for that belief (even though, ultimately, it may not have been legally correct).

**2.**

The Plaintiff established that the Debtor's failure to remove the mobile home caused it to

suffer economic injury.  While the mobile home occupied a lot in Walnut Meadows and the Debtor

failed to pay ground rent, the Plaintiff was deprived of the ability and opportunity to collect ground

rent, and later incurred the costs of demolishing the mobile home.

I also agree that leaving the mobile home on the lot in Walnut Meadows was wrongful,

thereby satisfying the "maliciousness" element of §523(a)(6).

This leaves the issue of "willfulness."

**3.**

In Conte, the Third Circuit held that deliberate conduct that either is specifically intended

to cause injury or that has "a substantial certainty of producing injury" satisfies the "willfulness"

element of 11 U.S.C. §523(a)(6): See 33 F.3d 303, 307-09.[6]

While there is nothing in the record that suggests the Debtor specifically intended to injure

the Plaintiff, there is some appeal to the Plaintiff's argument that the Debtor's knowing failure to

remove the mobile home from Walnut Meadows was substantially certain to cause the injury that

---

[6]        In Conte, the Third Circuit did not resolve an important issue related to the "substantial
certainty of producing injury" standard.  Is the standard measured objectively (i.e., whether there was an
objective, substantial certainty of the injury resulting as a consequence of the debtor's deliberate action, that
would have been known by a reasonable person) or whether it is measured subjectively (i.e., the debtor was
aware that the injury was a substantially certain consequence of the deliberate conduct).

        Generally, bankruptcy courts in this circuit have employed a subjective standard, i.e., that
a debtor must be subjectively aware that his or her conduct is substantially certain to cause injury, in
evaluating willfulness under 11 U.S.C. § 523(a)(6). See In re Gotwald, 488 B.R. 854, 865–66
(Bankr.E.D.Pa.2013) (collecting cases). The subjective standard arguably is a more rigorous for a plaintiff-
creditor to satisfy than an objective standard. In re Mickletz, 544 B.R. 804, 818 (Bankr. E.D. Pa. 2016).

        As I decide this case on other grounds, I need not determine whether a subjective or
objective standard should be applied here.

the Plaintiff suffered.  Nevertheless, I conclude that injury caused by the Debtor's conduct was not "willful" within the meaning of the statute because it was insufficiently "deliberate."

Two (2) related lines of thought bring me to this conclusion.

First, I consider certain "first principles" underlying the §523(a)(6) exception to discharge.

As the Supreme Court emphasized in <u>Geiger</u>, §523(a)(6) is designed to encompass intentional torts, where "the actor intend[s] the consequences of an act" and not "situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor."  523 U.S. at 62 (quotations and citations omitted).  This case presents the situation where the injury was not "desired" by the Debtor and was unintentional, as described in <u>Geiger</u>.

As for the <u>Conte</u> formulation of "willfulness," while it may have been inevitable that leaving the mobile home at Walnut Meadow would cause injury, the injury was not the product of "deliberate" or "voluntary" action by the Debtor.  Rather, in this case, the Debtor continually attempted to avoid injuring the Plaintiff by offering the mobile home for free on Craigslist, offering it for free to the Plaintiff and eventually transferring it to Mustard House.  Further, the Debtor testified credibly that he lacked the financial ability either to remove or demolish the mobile home.[7]

---

[7]     In reaching the conclusion that the harm caused by conduct that was not voluntary or deliberate does not render a debt nondischargeable under §523(a)(6), I draw support from another type of legal action that imposes liability for knowing misconduct: contempt proceedings for violating a court order.

A party who fails to comply with a court order (roughly analogous to the Debtor's failure to take action to remove or demolish the mobile home) "may defend against a contempt petition by coming forward with evidence showing that it is unable to comply with the order in question  . . .  and show[ing] that it has made in good faith all reasonable efforts to comply."  <u>Sec'y of Labor v. Altor Inc.</u>, 783 F. App'x 168, 171 (3d Cir. 2019) (citing <u>U.S. v. Rylander</u>, 460 U.S. 752, 757 (1983) and <u>Harris v. City of Philadelphia</u>, 47 F.3d 1311, 1324 (3d Cir. 1995)) (quotations omitted).

Here, the Debtor satisfied the standard of making a good faith and reasonable effort to remove the mobile home from Walnut Meadows.

21

Second, even though the Plaintiff's state law claim technically sounded in tort, its characteristics closely resemble that of a contract dispute. It is true that the parties did not enter into a written lease agreement. But the Plaintiff's chief complaint is based on the Debtor's failure to pay ground rent and to remove the mobile home. Had the parties entered into a written lease, the Debtor's failure to pay ground rent would have constituted a simple breach of contract unaccompanied by other tortious conduct. Case law firmly and repeatedly holds that routine breach of contract matters are not ones for "willful and malicious injury," within the meaning of §523(a)(6). See Catalan, 590 B.R. at 684 (citing Lockerby v. Sierra, 535 F.3d 1038, 1040 (9th Cir. 2008); Paige v. Lerner Master Fund, LLC, 584 B.R. 502, 509 (M.D. Pa. 2018); In re Kamps, 575 B.R. 62, 84 & n.13 (Bankr. E.D. Pa. 2017)); see also In re Marcella, 463 B.R. 212, 220 (Bankr. D. Conn. 2011) ("mere failure to pay an obligation cannot be a willful and malicious injury in and of itself").

In short, where the Debtor made every reasonable effort within his ability to avoid injuring the Plaintiff and, despite those efforts was unable to prevent injury to the Plaintiff, I hold that injury suffered was not "willful" under 11 U.S.C. §523(a)(6).

## V.  Conclusion

To summarize, I do not find the inadequacies in the Debtor's bankruptcy filings to rise to a level justifying a denial of discharge pursuant §727(a)(4)(A). Further, I do not find that the weight of the evidence can sustain a ruling that the Debtor's failure to remove a mobile home from the Plaintiff's property caused a "willful and malicious" injury to the Plaintiff within the meaning of 11 U.S.C. §523(a)(6).

An order entering judgment in the Debtor's favor will be entered.

Date:   November 4, 2020

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**